Opinion delivered March 18, 1887.

No. 2294.

## Mat Wheelis *v.* The State.

1. Practice—Eye Witnesses—Cases Explained.—It was not *held* in the cases of Hunnicut v. The State, 20 Texas Court of Appeals, 632, and Phillips v. The State, 22 Texas Court of Appeals, 139, that the State must in every case introduce all the eye witnesses of the *res gestæ*. As laid down in the latter case, this is a matter within the sound discretion of the trial court, though there may be cases in which the requirement should be made.

2. Self Defense—Charge of the Court—Case Stated.—In a trial for murder this appellant was convicted of manslaughter upon evidence which showed that the deceased, as appellant knew, had threatened to kill him if he should ever speak to him, and that, the deceased having dropped some coins, the appellant spoke to him and called his attention to one of them; whereupon the deceased, calling appellant a d—d son of a bitch, replied that he had told and sent him word not to speak to him. Appellant, saying "all right," went out of the back door of the house, and then called to him a relative of the deceased, and in their ensuing conversation said he could "not stand this," and that he would "kill him." Deceased, still in the house, commenced whittling, and was apparently listening, and soon, closing his knife and putting it in his pocket, walked towards where appellant was, and when he got about a third of the way, he took his knife out of his pocket and seemed to be opening it. Proceeding to and having passed out of the back door, he was shot and killed by appellant. A pocket knife, partly open, lay close by deceased on the ground, after he was shot. The trial court did not give in charge to the jury the law of self defense, and rejected a requested instruction on that subject. *Held*, that the evidence fairly raised the issue of self defense, and the defendant was entitled not only to have all relevant circumstances, whether anterior to or contemporaneous with the killing, put in evidence, but also the law of self defense given in charge to the jury.

APPEAL from the District Court of Rusk. Tried below before the Hon. J. G. Hazlewood.

The indictment charged the appellant with the murder of Hugh Mitchell, in Rusk county, Texas, on the thirteenth day of December, 1886. His conviction was for manslaughter, and the penalty assessed against him was a term of three and a half years in the penitentiary.

Doctor H. C. Miller was the first witness for the State. He testified that, between three and four o'clock on the evening of December 13, 1886, defendant came to him in the town of Overton and told him that deceased and others were in the back room of "Shack's" saloon gambling, and suggested that witness had better go and break up the game. Witness went to Shack's and found deceased behind the counter with some small change in his hand. Deceased treated witness to a glass of beer, and walked back to the front of the saloon, shaking the pieces of money in his hand. He dropped some pieces and the boys began pointing them out to him. Defendant, who meantime had come in, pointed out a piece, remarking: "Hugh, there is a piece." Deceased replied: "Mat Wheelis, you d—d son-of-a-b—h, I told you, and I sent you word, not to speak to me again." Defendant made some remark and left the house a minute later. After a time he came to the back door and motioned to witness, who went to him. Witness found him on the lower step of the platform that formed the back part of the saloon building. He approached witness at the head of the steps and said: "I can't stand this; I will kill him; I *must* kill him!" He repeated this remark several times in a loud tone of voice. Witness advised him to avoid a difficulty. He then said something about wanting to be friendly with deceased, but witness checked him with the remark that deceased did not want to be friendly. About this time deceased came out of the house. As he walked out of the door, defendant went down the steps, with his right hand under the left side of his coat. Deceased stepped around witness, down the first and second steps, and turned towards defendant. At that instant defendant excitedly drew his pistol and fired, the ball striking deceased fairly in the middle of the chest, killing him instantly. Witness sprang down the steps and caught and disarmed defendant. Defendant called out excitedly several times that he was afraid of deceased. Two or three minutes later defendant called witness's attention to a

pocket knife lying by deceased's left leg. The knife was about one-fourth open. No other weapon was found on the deceased's body. Deceased and defendant had not been on friendly terms for three or four years. Witness went into the saloon for the purpose of getting the boys to stop gambling, but discovered no sign of gambling.

Cross examined, the witness stated that the deceased's horse was hitched about six feet distant from the platform in a north-east direction. Defendant fired from the south end of the steps. The pocket knife spoken of by witness was not placed by the deceased's body by the defendant. It could not have opened by falling from deceased's coat pocket. Witness did not observe a knife in the hands of the defendant (deceased?) as he came out on the platform. He could have opened the knife on his way out without the witness seeing him. Deceased was facing the defendant when he received the shot. Defendant told witness that he was a friend of the deceased, but that the deceased would not believe it. Deceased, when drunk, was disposed to be quarrelsome. He was drinking but was not drunk when he was killed. He bore no malice toward any one except defendant. He often spoke to witness about his former difficulty with defendant. Defendant made no resistance when witness caught and disarmed him after the shooting. Witness employed counsel to prosecute in this case and would like to see justice done.

Re-examined, the witness said that he had often heard deceased say that he intended to have nothing more to do with defendant, and that if defendant would let him alone there would be no more difficulty. A few minutes after the killing, a stranger came up and shook hands with defendant. Defendant, referring to the killing of deceased, whose dead body was still lying there, said to the stranger: "That's my work."

With Doctor Motley's testimony, describing the nature of the fatal wound, the State closed.

George Bohannon testified, for the defendant, that he was in Shack's saloon when the killing of Mitchell occurred. He was standing by the stove observing Doctor Miller, deceased, defendant, Woodall, Wymer and Shack at the bar. Deceased dropped some money. Some one showed him a quarter on the floor, when defendant pushed a dime with his foot and said: "Hugh, here is a dime." Deceased replied: "Mat Wheelis, G—d d—n your insignificant soul, I don't want you to speak to me, you G—d d—n s—n of a b—h!" Shack said that he wanted no row in his

house, and defendant said, "All right," and walked out of the back door. He then turned and called Doctor Miller. Deceased and others came to the stove, and witness observed that deceased was trying to catch what was being said by defendant and Miller. Deceased finally started toward the back door, closing the knife he had in his hand, and putting it in his pocket. Before he reached the door he took his knife from his pocket, and, as the witness thought from the motion of his hands, opened it. He walked out of the door; the shot was fired, and deceased fell. Witness and the other parties in the room went out immediately to where the shooting occurred. Doctor Miller had hold of defendant with one hand and a pistol in the other. He called on Wymer to take charge of defendant, which Wymer did for the moment, but finally told Miller that he was not an officer and would not keep him. Witness saw a pocket knife, the large blade of which was partly open, in the deceased's right hand. Witness then left, following Woodall out of the front door, and went home. Deceased was drinking somewhat, but defendant appeared to be sober. The shooting occurred not more than three minutes after the deceased cussed the defendant. Defendant had not spoken to the deceased until he pointed out the dime. Defendant called Doctor Miller as soon as he got to the back door. Witness could not see him, but could see a part of Doctor Miller's form while he and defendant were talking on the platform. Witness had known deceased some ten years, and had been friendly with him for the last three years. They had a falling out about three years ago, which lasted two or three weeks. Deceased was drinking considerably. He had a glove on one hand. The knife was in his ungloved hand. The deceased made no demonstration at defendant when he cursed him about the dime. Defendant made no demonstration at deceased, but turned and walked out of the saloon, with the remark, " all right," in answer to Shack's demand that there should be no difficulty in his house. Deceased took his knife from his right hand pocket as he went to the door where Miller and defendant were talking. His back was then to the witness, but the witness saw a motion of his hand which indicated that he was opening his knife. Witness and defendant were friends.

J. M. York testified, for the defense, that, some three or four weeks prior to his death, the deceased talked to witness about his personal difficulties, remarking, as a conclusion, that he was going to reform and be a better man; that his difficulty with de-

fendant was the only one in which he had ever been hurt, and that he had told and sent defendant word that if he ever spoke to him again he intended to kill him. Witness told him that if he intended to reform he had better drop that matter. He replied: "No; if he ever speaks to me again I intend to cut his God d—d heart strings out." No one heard this conversation, and witness repeated it for the first time after the killing.

R. A. Andrews testified, for the defendant, that he reached the scene of the tragedy about ten minutes after it occurred. He saw the deceased's body and a small knife, the large blade about half open, lying near the left hand. Doctor Miller, the deceased's uncle, afterwards took the knife, and witness has not seen it since. In a short while Willie Mitchell ran up and exclaimed: "Oh, doctor! he is dead!" Doctor Miller replied: "Yes; brutally murdered!" Defendant said: "Doctor, don't say that. You know I've been running from him a long time." Doctor Miller said: "Hush! I told you to keep away from him." About this time defendant was turned over to Wymer, and Doctor Miller began to search the pockets of the deceased. Defendant said: "Remember, doctor, that knife was open." Doctor Miller replied: "You are a d—d liar." It was the recollection of the witness that the defendant said that he had it to do. The deceased was, when drinking, a quarrelsome man, and usually carried deadly weapons on his person. He was a deputy sheriff for many years.

J. C. Leath testified, for the defense, that he knew and was friendly to both defendant and deceased. He had heard deceased make threats against the defendant. Speaking of a difficulty they had had, he said that if defendant ever spoke to him again he would cut defendant's God d—d heart out; that defendant had cut him in the back. Wiley, Woods and York were present at the time the threat was uttered. Woods and Wiley corroborated Leath, and, in addition, Wiley testified that, at a barbecue in July before the killing, at which defendant was running a lemonade stand, he heard the deceased, who was then standing within a few feet of defendant, in a loud tone of voice curse the defendant, and say that if defendant ever spoke to him again he would cut defendant's heart out. Witness advised defendant then to avoid deceased, as deceased evidently wanted a difficulty.

Sheriff Rogers testified, for the defense, that a jail delivery of the Rusk county jail occurred on the night of December 24, 1886.

Three prisoners made good their escape.    The defendant came direct to witness and gave himself up.

John Whitley testified, for the defense, that he was an active member of a dramatic club.    That club gave an entertainment on Friday night before the killing.    Witness borrowed of defendant the pistol with which the killing was done to use it in the performance.    Defendant took the only cartridge that was in the pistol and placed it in his vest.    On Saturday evening witness returned the pistol to defendant, who took the cartridge from his vest pocket, placed it in the pistol, and then put the pistol in his pocket.    It was shown by several witnesses that but one chamber of defendant's pistol was charged when he fired the fatal shot.

W. R. Hendley testified, for the defense, that he reached the scene of the killing about four minutes after it occurred.    Doctor Miller had hold of defendant with one hand, and held a pistol in the other.    Miller said to defendant: "You have killed him for nothing."    Defendant replied: "I have run from him to keep from doing it."    Miller then said: "He did not have a thing," and defendant said something about a knife.    Witness saw a pocket knife lying on the ground near the body of deceased.    The large blade was about half open.

W. Woodall was next introduced by the defense.    In substance, his testimony was the same as that of the witness Bohannan, except that he disclaimed hearing anything that was said at the body.    He denied that he had ever told anybody that the knife, when he saw it, was lying on the left side of deceased. It was lying to the right of the body.

The defense closed.

Shackelford and Wymer were introduced by the State in rebuttal.    Their testimony did not vary perceptibly from that of previous witnesses as to what occurred at the saloon up to the firing of the pistol.    Both, however, testified positively that the pocket knife was found on the left side of the body of the deceased.

Doctor Miller, recalled by the State, testified, in rebuttal, that he remembered being warned of the approach of Willie Mitchell, in an excited state, at the time the examination of the body was going on, and that some one expressed fears that he might do something rash.    To that, witness replied that no friend should hurt defendant while he, defendant, was in his, witness's charge. Witness denied that he said anything to Willie Mitchell, or any

other person at the body, about deceased being brutally murdered. Defendant said, immediately after the killing, that deceased had a knife in his hand, and that he "had it to do." The cocking of a pistol can be heard by a person of acute hearing twenty-five or thirty feet. Witness's hearing was cultivated and acute. Defendant's right hand was under the left skirt of his coat while deceased was passing witness. When deceased turned, defendant merely dropped his hand, raised it and fired. Had he then cocked his pistol, witness would assuredly have heard the click of the hammer.

D. P. McNair testified, for the State, in rebuttal, that he reached the scene of the killing four minutes after the killing, and was present when Willie Mitchell ran up. Doctor Miller remarked as Willie came up: "I hope no friend of mine will hurt him (defendant), but let the law take its course." Some minutes after Willie arrived, a stranger came up, spoke to and shook hands with defendant. Defendant pointed to the dead body and said laughingly: "Look there! that is my work." Witness knew that some men had a harsh, chilly laugh when mad or excited. He could not say that defendant was exulting over deceased's death. Witness, while on the ground, heard defendant say to Charlie Christie: "Charley, you know I had to do it, and you will have swear to it." Christie replied: "I can't swear to that. I have to meet my God. I was around the corner and did not see it." Defendant replied: "Charley, remember he was coming on me with a knife, and I had to do it."

The motion for new trial raised the questions discussed in the opinion.

*Buford & Hall*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

HURT, JUDGE. This was a conviction for manslaughter. From the statement of facts it appears that deceased, Hugh Mitchell, had, on divers occasions, theatened to take the life of appellant, especially if appellant should speak to him; and that these threats were communicated to appellant. Also that, just before the homicide, while in the saloon, deceased let fall some pieces of silver coin on the floor, which, becoming scattered and causing some delay in gathering up, appellant said: "Hugh, here lies a piece." Deceased replied, "I have told you and sent

you word, Matt Wheelis, you d—d son of a bitch, never, to speak to me;" to which appellant replied, "all right," and went out at the back door of the saloon. When out, he called to Doctor Miller, uncle to deceased, to come out, that he wanted to talk to him. Miller went out and they engaged in conversation, appellant telling Miller, in substance, that he "couldn't stand this;" "I will kill him; I must kill him," in a rather loud tone of voice. While these remarks were being made, deceased, still in the saloon, turned around and walked from the counter to the stove and commenced whittling. He stretched up his head, as if listening, then shut up his knife and started out, putting his knife in his pocket. When he had got about one-third of the way out, he put his hand into his pocket and got his knife again, acting as if opening it. When he got out of the back door the pistol fired and deceased was shot by appellant.

Several persons witnessed these facts, whereupon appellant's counsel moved the court to compel the State to introduce all the eye witnesses to the transaction; which was denied, and an exception to the ruling was noted.

It seems from the brief of the counsel that the Hunnicutt opinion (20 Texas Ct. App., 632) is so construed as to require the State to introduce all the testimony of witnesses to the transaction in all cases. My brethren do not, nor did they in that case, intend to convey any such idea. It is expressly stated in that case and in the Phillips case (22 Texas Ct. App., 139) that this matter is in the sound discretion of the court. That there may be cases in which the rule would not apply, is clearly stated. We advise counsel to re-read the Hunnicutt case, and it will be seen that no general rule is attempted to be stated. There was no error in refusing the motion.

As before stated, deceased had threatened the life of appellant, and of these threats appellant knew. Just before the homicide, deceased had acted in a manner calculated to produce serious apprehension that these threats would be put into execution. At the time the fatal shot was fired, the conduct of deceased was susceptible of two constructions: the one, innocent; the other, threatening. Now, under this state of case, what instruction should be given the jury? Abstract propositions? No; they will not alone suffice, though correct.

There is but one issue presented, viz: Had the appellant reasonable grounds for fearing death or serious bodily harm? To decide this issue correctly, the relations of the parties to each

other, their feelings towards each other and the nature of those feelings, should be known to the jury. And not only should this be known, but the charge of the court should be so framed as that the jury might correctly comprehend the purposes for which the facts are admitted in evidence. They can be so presented as not to be upon the weight of evidence.

Keeping in mind the issue, to what facts could the jury look in determining the issue? Clearly to all the facts; to those transpiring at the time, as well as those occurring before. If deceased had threatened appellant's life, this alone would not justify the homicide. To justify under threats it must be shown that, at the time of the homicide, the person slain, by some act then done, proposed to execute the threats. The threat being to kill, he must have manifested an intention to execute that threat.

Now, if the act done manifests an intention to kill, when viewed alone—disconnected from the threat—then the threat would avail nothing. The right of self defense would remain with the accused, independent of the threats. But suppose the acts of the deceased, standing alone, were harmless in their import, but of a serious and deadly character when viewed in the light of the threats (which was a phase of this case); in such case the threats become of the first importance.

Taking with us these observations, let us notice a special charge requested by appellant and refused by the court. It is as follows: "The jury are further instructed that, in determining the existence of actual or apparent danger, they are to view the facts of the case from the standpoint of the defendant, placing themselves in the position of the defendant at the time of the killing, taking into consideration the threats made by deceased against defendant—if any were made—the general reputation of the deceased for violence, if such has been proved, and the language and conduct of the deceased just before and at the time of the homicide, if such be in proof, in determining the guilt or innocence of the defendant." This charge was demanded by the most vital issue in the case, and should have been given. The learned trial judge refused to give this special instruction because he believed its substance had been already given in the general charge.

We have given the charge careful and repeated examination, but fail to find this refused charge incorporated in any form in

the charge of the court.   The refusal was error, for which the judgment must be reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered March 18, 1887.